NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

FLINT INK CORP., et al.,

               Appellants,            CIVIL NO. 06-2517 (GEB)

    v.

ANTHONY R. CALASCIBETTA,

               Appellee.          **MEMORANDUM OPINION**

**BROWN, Chief District Judge**

These matters come before the Court upon Appellants' Flint Ink Corp. (hereinafter "Flint") and Trustee Anthony R. Calascibetta (hereinafter "Trustee") appeals the March 22, 2006 Orders of the United States Bankruptcy Court which partially granted Flint and Trustee's cross-motions for summary judgment.  The action was reassigned to the undersigned on June 15, 2007, and the Court, having read and fully considered all of the parties' submissions, has decided these matters without oral argument pursuant to Fed. R. Civ. P. 78.   For the reasons discussed in this Memorandum Opinion, the above Orders of the Bankruptcy Court dated March 22, 2006 are reversed.

**I.      BACKGROUND**

Debtor Strategic Technologies, Inc. (hereinafter "STI") conducted the business of providing auditing and processing of freight invoices issued by freight carriers to STI customers. (Flint Brief, p. 5).  Flint was one of the customers of STI.  (*Id.*).  Specifically, STI and Flint entered into an Agreement dated January 1, 1999, in which STI agreed to be Flint's agent, with

authorization to make freight charge payments to carriers who had rendered services to Flint (hereinafter "Agreement").  (*Id.*).  The Agreement stated, in pertinent part:

> STI will act as the Company's [Flint's] agent to make, on Company's behalf, payment of Carrier freight charges billed for freight services provided to Company by Carriers designated by Company . . . Company will electronically transfer funds within forty-eight hours of receipt of payment summary the exact amount of such freight charges to a predetermined account at the bank which has been designated by STI, STI will pay all Carriers by check through the US Postal Service unless otherwise specified by the Company.  STI agrees to issue payment forty-eight hours from receipt of transfer of collected funds . . . [I]t is understood and agreed that Company will pay STI freight payment processing fees, pursuant to Schedule A, for the services described herein above and that such processing fees are separate and in addition to the money transferred by Company to STI with which STI makes payments to Company's Carriers on behalf of Company.

(Flint Ink Brief, pp. 5-6).  The payments were weekly, with STI requesting specific amounts for payment to the carriers.  STI would provide wire transfer instructions to Flint, who would dutifully follow said instructions and provide the requested funding.  (*Id.*).  The agreement between STI and Flint was extended on a month to month basis.  (Trustee Brief, p. 6).

On or about June 13, 2002, in keeping with the agreement between the parties, Flint transferred $1,105,538.98 to a funding account at Fleet Bank for payment of freight invoices which were incurred during the period of June 3, 2002 through June 9, 2002.  (*Id.* at p. 7).  On or about July 3, 2002, STI issued a check to Flint in the amount of $941,538.98.  (*Id.*).  The check issued to Flint by STI cleared the bank on July 10, 2002.  (*Id.*).  However, between June 13, 2002 and June 28, 2002, the Funding Accounts[1] were overdrawn on two different dates.  (*Id.*).

---

[1]  Although only one Funding Account at Fleet Bank existed during the bulk of the time periods of time in question, on June 10, 2002, STI opened a new funding account at Commerce Bank.  At the time STI returned Flint's funds, STI was in the process of transitioning accounts from the Fleet Bank Funding Account to the Commerce Bank Funding Account.  The transition began in full force with the first customer depositing funds into the Commerce Bank account on July 2, 2002.  (Trustee Brief, p. 4).

Accounting efforts later undertaken over the course of the underlying bankruptcy demonstrated that during the time frame in question, June 13, 2002 through July 10, 2002, the "only non-customer money in either Funding Account was a deposit STI made from its Payroll Account." (Bankruptcy Opinion, p. 26).  Notably, the monies taken from the Payroll Account and deposited into the Funding Account were, at least in part, monies previously taken from the Funding Account and put into the Payroll Account by STI to cover payroll costs.  (Flint Brief, p. 25).

On June 21, 2002, STI and Flint conducted a telephonic conference, whereby "new procedures for freight payments" were established.  (*Id.*).  A confirming email of the telephone conference between the parties was issued on that same date.  The email states, in pertinent part, that "[e]ffective today, June 21, 2002, STI will cease carrier payment on behalf of Flint Ink . . . STI has agreed to return the funds to Flint Ink for bills processed but not paid, as well as returning the $672,980.02 Flint Ink wired STI this week."  (*Id.*).

Evidence was presented to the Bankruptcy Court suggesting that the agreement to cease business and return funding was the result of information that Flint had received in "mid-June, 2002" indicating that STI was experiencing financial difficulty and was considering filing for bankruptcy relief.  (Bankruptcy Court Opinion, p. 7; citing Huresky Cert., Ex B, interrogatory answer 13).

On July 18, 2002, STI did indeed file a voluntary petition under Title 11, Chapter 11 of the United States Code.  (Flint Brief, p. 3).  On July 23, 2002, the Bankruptcy Court issued an Order directing the appointment of a Chapter 11 Trustee.  (*Id.*).  On July 25, 2002, Anthony Calascibetta was appointed at the Trustee.  (*Id.*).  After the Trustee began looking into the finances of STI, the Trustee determined that STI could not continue to operate its business and

recommended that the Chapter 11 petition be converted to a Chapter 7 case.  (Trustee Brief, p. 3).

Thereafter, on July 31, 2002, the Bankruptcy Court converted the Chapter 11 petition to a

Chapter 7 case and appointed Calascibetta as the Chapter 7 Trustee.  (*Id.*).

      The Trustee's examination of the records revealed that when STI provided auditing

services, STI's customers would either pay the audited bill directly to the freight carrier and remit

a fee to STI, or pay the amount due the carrier directly to STI.  (*Id.*).  When a customer chose to

pay the amount due to freight carrier directly to STI, the funds received from said customer were

commingled in a single STI bank account (hereinafter the "Funding Account").  (*Id.*).  The

Funding Account had an accompanying controlled disbursement account, where checks drawn on

the Funding Account were paid.  (*Id.* at p. 4).  When checks drawn on the Funding Account were

presented to STI's bank, the bank automatically transferred the amount of funds necessary to

cover the checks from the Funding Account to the controlled disbursement account.  (*Id.*).

      Additionally, the bank would also transfer funds from the Funding Account to an

"overnight investment."  (*Id.*).  The investment funds and the interest earned thereon were then

re-deposited into the Funding Account.  (*Id.*).

      Separate and apart from the Funding Account and the controlled disbursement account,

STI maintained two other accounts, constituting a payroll account and an operating account.

(*Id.*).

      However, the Trustee's examination of the records also showed that STI failed to perform

or subsequently maintain bank reconciliations of the Funding Account to match specific

customer receipts with payments to freight carriers and cleared checks.  (*Id.* at p. 5).  Therefore,

once money was transferred into the Funding Account by a customer, those monies were

-4-

commingled with the monies of other customers.  During the normal course of a day of business conducted, numerous deposits and withdrawals, totaling in the millions, would be deposited and withdrawn from the Funding Account with no reconciliation reflecting which funds were transmitted and why.  (*Id.*).

Further, the Trustee's examination revealed that from in or about 1993 up to the date of STI's Chapter 11 petition, STI took monies from the Funding Account for unrelated purposes. These unrelated purposes included the transfer of monies from the Funding Account to the payroll and operating accounts to cover STI business expenses, which STI disguised by creating fictitious invoices from a related entity.  (*Id.* at p. 6).  Additionally, Marc Cooper, STI's president and sole shareholder, transferred money from the Funding Account to a privately held joint banking account in his and his wife's names.  (*Id.*).  All told, it was discovered that "at least" $1.6 million had been wired from the Funding Account into the Coopers' account between 1997 and 2002.  (*Id.*).  It was further revealed that STI had been insolvent since at least 1993.  (*Id.*).

STI's debt by July 31, 2002 totaled $20,350,000.00.  (*Id.*).  The "under-reported" liability to customers at that time was $47,698,000.00.  (*Id.*).  Losses to customers totaled $87 million. (*Id.*).

## II.   APPEALS BY FLINT AND TRUSTEE

On April 16, 2004, Trustee filed a motion for summary judgment, which sought to have the $941,538.98 paid to Flint by STI returned, asserting that the payment constituted a preferential transfer.  (*Id.* at p. 8).  On May 25, 2004, Flint filed a cross-motion for summary judgment asserting that the aforementioned sum was not a preferential transfer, but rather, that STI was holding the money in trust, and as such, cannot be considered estate property for

purposes of bankruptcy.  (*Id.*).  The Trustee countered by arguing that "it does not matter what kind of trust may have existed . . .[regardless of a trust] a defendant in a preference action has the same burden to trace funds allegedly subject to a trust as does a claimant seeking to reclaim alleged trust funds from the bankruptcy estate."  (Bankruptcy Opinion, p. 13).

On March 22, 2006, the Bankruptcy Court issued a 29-page Opinion and two Orders. (Bankruptcy Docket).  The Bankruptcy Court held that the money provided to Flint was held in an express trust, but that a tracing requirement was nevertheless in order.  The Bankruptcy Court further held that a tracing requirement mimicking the lowest intermediate balance test was appropriate, and that the burden of tracing should be placed upon the Trustee.  The Bankruptcy Court determined that the Commerce Funding Account stood at $2,454,989.51 before the STI check to Flint for $941,539.98 cleared the account.  The Bankruptcy Court further determined that, "by simple subtraction," the sum of $1,513,450.33 remained in the account after the Flint check cleared Commerce Bank, and that the STI funds "which can be attributed to the payment to Flint from the Commerce Funding Account amounts to $336,549.47" (the result of subtracting the $1,513,450.53 which remained after the payment to Flint, from the $1,850,000 deposited by STI).  (March 22, 2006 Bankruptcy Court Opinion).

## III.   DISCUSSION

### A.   <u>Standard of Review</u>

Bankruptcy Rule 8013 provides, in pertinent part: "On appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.  Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the

opportunity of the bankruptcy court to judge the credibility of witnesses."  "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conclusion that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

A bankruptcy court's conclusions of law, on the other hand, are subject to plenary review. *See Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir. 1988). Where mixed questions of law and fact are presented, the appropriate standard must be applied to each component of the appeal.  *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989).  Here, the facts are undisputed.

The question before this Court is a question of law, and as such, the Bankruptcy Court's March 22, 2006 Opinion and Orders are subject to plenary review.

**B.      Was the Agreement and Nature of Business between STI and Flint an Express Trust?**

When a Chapter 7 Bankruptcy Trustee is appointed by a bankruptcy court, all right, title and interest in the debtor's property vests by operation of law in the Trustee, whether or not the debtor claims the property as exempt or not.  *See* Title 11, United States Code, Section 541(a). Property of the estate, as defined by the Bankruptcy Code, is intended to encompass virtually all legal and/or equitable interests of the debtor in property, wherever said property may be located. 11 U.S.C. § 541(c)(2).  Of course, there are some property interests which are exempt, i.e., cannot be considered part of the property of the estate.  *Id.*.  Further, property for which the debtor is acting as a trustee and holding legal title becomes part of the estate, but only to the extent of the debtor's legal interest.  11 U.S.C. § 541(d).

While the Trustee takes the rights and interests in which the debtor possessed, the Trustee also is provided, through congressional statutory authority, with the powers of avoidance and recovery pursuant to 11 U.S.C. §§ 543, 547, 550, 553 and 723.  The powers provided to the Trustee are intended to further Chapter 7 goals, which are: (1) to establish a fresh start for the debtor; and (2) to ensure the equitable distribution of net sale proceeds of any available properties to the creditors.  *See* BKRPRACHB § 7:40.  The Trustee's avoiding authority exists to prevent a debtor from favoring a particular creditor by transferring property to said creditor shortly before the debtor files for bankruptcy.  *Id.*.  Transfer of property to a favored creditor prior to filing bankruptcy, and the ability of a Trustee to avoid such a transfer after a bankruptcy petition is filed, is called a voidable "preference."  11 U.S.C. § 547.

To establish a voidable preference, the Trustee must show, by a preponderance of the evidence, that a transfer of an interest of the debtor in property: (1) was made to or for the benefit of a creditor; (2) for or on account of an antecedent debt owned by the debtor before such transfer was made; (3) while the debtor was insolvent; (4) was made (a) on or within 90 days before the date of the filing of the petition or (b) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and (5) enabled such creditor to receive more than such creditor would receive if (a) the case were a case under Chapter 7, (b) the transfer had not been made, and (c) such creditor received payment of such debt to the extent provided by the provisions of Title 11 of the United States Code.  *See* 11 U.S.C. § 574(b); *In re White*, 258 B.R. 129, 132 (Bankr.D.N.J.2001).

However, if a debtor transfers property before the bankruptcy petition is filed that would not have been subject to distribution to creditors, the avoiding powers may not be utilized by the

-8-

Trustee.  In other words, the property must be "property of the estate" under § 541 of the Bankruptcy Code, in order for the Trustee to subsequently so avoid.  *See* 11 U.S.C. § 541(a)(1) and (b).  *See also Begier v. I.R.S.*, 496 U.S. 53, 59 ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property' of the estate"); 48 AMJUR POF 3d 159 ([the doctrine of earmarking] is based upon the common concept that a fiduciary has no recoverable interest in the property of a trust, and includes funds or other property placed in the hands of the debtor as trustee of an actual or implied trust"); *In re Bake-Line Group, LLC*, 359 B.R. 566 (Bankr.D.Del.2007) (holding that allegations of preference were invalid because the transfer did not involve any "interest of the debtor in property, as required for avoidance of transfer as preference"); *In re Congoleum Corp.*, 2006 WL 2085428 ("the trustee . . . bears the burden of proving all five elements of a preference").

In consideration of the above, before the elements of a preference can be analyzed, this Court must determine if STI's payment to Flint constituted a transfer of interest in STI's property.  *Id.* at *2.  To determine whether STI's payment to Flint constituted a transfer of interest, it must first be determined whether the Agreement between STI and Flint, and thereby the very nature of the business between said parties, constitute a trust.  If the Agreement and nature of business between the parties does constitute a trust, such funds would not ordinarily be considered property of STI's estate, and consequently not be subject to avoidance by the Trustee.

This Court concludes that the Agreement between STI and Flint, as well as the nature of the business between the parties constituted a trust.  Specifically, the Agreement states that STI's role in their business relationship was to act as an agent for Flint, for the purpose of paying freight carriers Flint had utilized and had owed.  Further, the Agreement made clear that STI was

to render payments for Flint to the carriers within 48 hours of STI receiving the funds from Flint. Indeed, the relationship between Flint and STI, as well as the language of the Agreement, exactly mirror the elements of a trust, which can be found in Restatement (Second) of Trusts § 2 (1959), and which are, in pertinent part, as follows: (1) a designated beneficiary; (2) a designated trustee who is not the beneficiary; (3) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (4) actual delivery of the fund or other property. Therefore, a trust did exist between STI and Flint at all times relevant.

Additionally, this Court further concludes that the Agreement and nature of the business between STI and Flint constituted an express trust.  In order to determine whether a trust is express or constructive, this Court must look to the law of the forum state.  This is because an overriding federal policy is not present in determining the extent of a debtor's interest in property.  *Butner v. United States*, 440 U.S. 48, 55 (1979).

Therefore, the Court turns to state law.  As the Bankruptcy Court correctly points out, in *State v. Atlantic City Elec. Co.*, 23 N.J. 259, 266 (1957), the Supreme Court of New Jersey found that "[w]hether a trust or a debt is created when one party pays money to another primarily depends upon their intentions."  Additionally, in *State v. U.S. Steel Co.*, 12 N.J. 51, 58-59 (1953), the Court held that "[t]o express the requisite intention, it is not necessary that the word 'trust' be used."  As defined in the Restatement (Third) of Trusts, § 2, Comment f (2003), an express trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries.

-10-

Again, and for the reasons stated previously, the elements of an express trust closely mirror the Agreement and nature of business between Flint and STI.  Although the Agreement between the parties does not set forth the term "trust," the implied intent of the parties was evident.  STI was to receive and hold, for no longer than 48 hours, funding from Flint to pay carriers owed by Flint.  STI received a fee for its services, which was separately rendered and deposited.

As such, the Court concludes that the Agreement and nature of the business between Flint and STI constituted an express trust.[2]

### C.   When STI Transferred Funds from its Payroll Account to the Funding Account, did the Trust Extend to Said Funds?

Flint argues that the Bankruptcy Court was correct in determining that the Agreement and business relationship between Flint and STI was an express trust, but erred in not holding that the express trust was exempt from a preference action as property not belonging to the estate.  Flint further argues that the Bankruptcy Court instead crafted a right to trace funds, and that right was crafted to accommodate the funds that were transferred by STI from its payroll account to its Funding Account as "funds that could otherwise have been used to satisfy the Debtor's creditors."  (Flint Brief, p. 10; Bankruptcy Opinion, p. 27).  Flint asserts that the deposit of personal monies into an express trust does not destroy the trust, but rather, "the trust is extended to said deposits."  (Flint Brief, p. 10).  Flint further asserts that even if the Bankruptcy Court chose to ignore the trust extension principle, that the amount of personal monies was negligible because the funds that were taken from the payroll account were in actuality funds previously

---

[2]  The Court recognizes that the principle of exclusion of trust funds from a debtor's estate in a preference action also extends to constructive trusts.  *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92 (3d Cir. 1994).

stolen from the Funding Account.  (Flint Brief, p. 25).  Finally, Flint argues that even if the

payroll account deposit into the Funding Account could be characterized as debtor funds, there is

no method in which the transfer of payroll funds could be traced, as account statements for the

Funding Account simply show a starting and ending balance at the beginning and end of the

month, and as such, the amount Ordered to be returned to the debtor by Flint could only be an

estimate.  (Flint Brief, pp., 10-12).

       To support its contention that the exemption rule in a preference action is extended to the

Payroll Account monies deposited into the Funding Account, Flint relies on case law originating

from, among other sources, the Sixth and Ninth Circuits.  Most significantly, Flint relies upon a

published Third Circuit opinion in support of its assertion.

       The Trustee, in opposition, asserts that even if an express trust did exist, Flint would be

required to trace the funds.  The Trustee relies on case law originating from, among other

sources, the Sixth and Ninth Circuits, in direct contradiction to the Sixth and Ninth Circuit cases

to which Flint refers.  Of particular relevance, the Trustee relies upon a previously litigated

proceeding arising out of STI's bankruptcy case and involving the same Funding Account in

question, in which the Third Circuit, in an unpublished opinion, ruled that funds in the STI

Funding Account are to be presumed property of the estate absent a claimant's ability to trace.

Based on the Third Circuits prior determination, the Trustee references the Law of the Case

doctrine.

       This Court will begin by considering the applicable Third Circuit cases.  In *In re*

*Goldberg*, 932 F.2d 273 (3d Cir. 1991), a published opinion issued by the Third Circuit, Chapter

7 Debtor Harvey Goldberg, a New Jersey attorney, had misappropriated money entrusted to him

by his clients. *Id.* at 275. Mr. Goldberg would remove funds from an Attorney Trust Account, which were funds held in trust for his clients, for personal use, specifically gambling. *Id.* He would replace the missing trust funds with his gambling winnings, or with funds from new clients. *Id.* Those laying claims to the funds clamored to establish their rights as trust recipients. In its ruling, the Third Circuit held that "whatever funds that Goldberg added to the Attorney Trust Account to compensate for what he misappropriated became a part of the Attorney Trust Account." *Id.* at 280 (citing *In re California Trade Technical Schools v. United States*, 923 F.2d 641, 646 (9th Cir. 1991)).

The Trustee makes no direct attempt to distinguish *Goldberg*, but rather, cites to it in his moving and reply papers in support of his position that it is necessary for a claimant to trace its funds in order to establish the existence of a trust in federal bankruptcy court. *Goldberg* at 280.

In its March 22, 2006 Opinion, the Bankruptcy Court , in answer to Flint's argument and of the Third Circuit's holding in *Goldberg* held:

> The Court is not persuaded by Flint's argument. The <u>Goldberg</u> case did not involve a preference action. Rather, the dispute before the Third Circuit centered on how to allocate the funds in an attorney trust account between the title insurer and the New Jersey Lawyers' Fund for Client Protection to cover losses suffered by the attorney's clients . . .

*Id.* at p. 26.

Next for consideration is the unpublished but significantly related Third Circuit opinion in *In re Strategic Technologies, Inc. (Gulfstream Aerospace Corp. v. Anthony Calascibetta)*, 142 Fed. Appx. 562 (3d Cir. 2005). As previously stated, *Gulfstream* addresses another previously litigated issue arising from STI's bankruptcy proceeding. Gulfstream Aerospace Corp., a customer of STI's, much like Flint, had deposited $208,436.89 into the Funding Account on July

15, 2002.  As previously stated, STI filed for bankruptcy on July 18, 2002.  *Gulfstream* at 564.

At a certain point during the bankruptcy proceedings, the Trustee commenced an action naming all STI customer-creditors as defendants.  Eventually, almost all of the creditors settled.  Gulfstream remained as the hold-out defendant.  *Id.* at 565.  The bankruptcy court ruled that the remaining funds of the Funding Account were to be distributed pro rata, and that a final order regarding the Trustee's motion for summary judgment against Gulfstream was to be entered in the Trustee's favor.  Gulfstream filed a cross-motion for summary judgment, seeking the return of the entire amount it deposited into STI's Funding Account on July 15, 2002.  "Gulfstream offered three arguments in support of its motion [for summary judgment]: 1) none of the money in the funding account is property of the bankruptcy estate and therefore it can only be used to pay the beneficial owners; 2) although the trust money is commingled, the universe of co-owners of the money is determinable; and 3) the Trustee erred in preferring the claim of Knoll [a former customer of STI who mistakenly transferred $255,468.03 to STI after STI had filed for bankruptcy, and who the bankruptcy court ordered be repaid in full from the existing funds]."  *Id.* The bankruptcy court rejected Gulfstream's arguments and affirmed the final order in favor of the Trustee.  Gulfstream appealed.  *Id.*

The relevant portion of the *Gulfstream* decision lies in Gulfstream's initial argument that because the bankruptcy court and the Trustee agreed that the money in the Funding Account was primarily customer money held in a trust, the bankruptcy court did not have jurisdiction to direct the disposition of said funds.  The Third Circuit held that although there was evidence that the amount of STI money in the Funding Account was "negligible," the bankruptcy court's finding that Gulfstream's funds were commingled in a single account with other clients' funds as well as

STI funds was proper.  *Id.* at 565-66.  The Third Circuit ruled that when funds are commingled, and a trust recipient claims a right in those funds, a claimant must demonstrate the trust relationship and identify and trace the trust funds if they are commingled.  *Id.* at 566.  The Third Circuit concluded that, since Gulfstream had failed to sufficiently identify its funds in the commingled account, all monies in the Funding Account were to be presumed part of the bankruptcy estate.  *Id.*

Flint dedicates a large portion of its reply brief to distinguishing *Gulfstream* from the present circumstances.  Flint argues, in pertinent part, that the Third Circuit in *Gulfstream* was "considering the affirmative claim of a trust beneficiary . . . [h]ere, Flint is defending a claim of preference . . ."  (Flint Reply Brief, p. 2).  Additionally, Flint argues that the Third Circuit erred because its conclusion was based upon the premise that the Funding Account contained monies belonging to STI when in actuality, an express trust exists, which precludes a finding that STI funds are contained therein.  (*Id.* at p. 5).

The Bankruptcy Court considered the holdings in *Gulfstream* in its March 22, 2006 Opinion, and stated, in pertinent part:

> Nor does the decision in *[Gulfstream]* dictate a different result . . . [t]he Third Circuit held that this Court's finding that Gulfstream's funds were commingled with STI funds and those of other customers was not clearly erroneous.  It further stated that '[b]ecause Gulfstream could not sufficiently identify its funds in the commingled account, all of the Commerce Account Funds are presumed to part of the bankruptcy estate.' (*Gulfstream* at 566).  The ruling cannot be extrapolated and applied in this adversary proceeding because the issues are very different.  In the above decision the Court had before it a commingled fund and a claim based on constructive trust.[3]  Here, the matter is a preference action where the Trustee

---

[3] In *Gulfstream*, the Third Circuit was contemplating a different bank account than the one considered here.  During the bankruptcy proceedings, the Bankruptcy Court ordered that all funds remaining in STI's various bank accounts, including STI's payroll account, the Funding Account and an operating account that STI maintained, be put together into an interest-bearing segregated account.  *Gulfstream* at 564; Flint Reply Brief, p. 6, fn. 3.  It was the segregated

asserts a tracing obligation, not to prevent diminution of a fund, but to augment a fund. Further the defenses asserted against the preference action involve claims of express trust by Flint and contentions that STI lacked sufficient control over the Funding Accounts.

This Court concludes that the basis of the Bankruptcy Court's distinction between the underlying preference action and the *Goldberg* and *Gulfstream* cases is correct. Neither of the Third Circuit cases address a preference action, and that distinction is key. A preference action requires the satisfaction by the Trustee of several factors. Further, the property involved in the transaction the Trustee seeks to avoid must have been property of the estate. *See supra at Section B.* Because a preference action can only be initiated under certain conditions which require the satisfaction of codified individual factors, render inapplicable those cases where a trust beneficiary makes an affirmative claim for the return of monies said beneficiary alleges belonged to it. The context is too dissimilar. Therefore, the Court will turn to non-binding authority in other circuits for guidance.[4]

The Third Circuit in *Goldberg* cited *In re California Trade Technical Schools v. United States*, 923 F.2d 641, 646 (9th Cir. 1991) in support of the assertion that funds added to an attorney trust account to compensate for prior misappropriation became part of said account. In *California Trade*, a Chapter 7 trustee filed a complaint to recover funds that were transferred by the trade school debtor to the United States Government as an avoidable preference. The Ninth

account to which the Third Circuit referred, and because the segregated account contained significant amounts of commingled funds, the Third Circuit ruled the trust to be constructive. For our purposes, based upon the evidence before this Court, the trust is to be considered express. *See supra at Section B.*

[4] Because the related Third Circuit decision in *Gulfstream* did not contemplate an underlying preference action, and because the Third Circuit was presented with a commingled segregated account as opposed to the Funding Account at issue here, the Court finds that the Law of the Case Doctrine is inapplicable.

Circuit held the debtor trade school's repayments of federal student assistance program monies which were previously misappropriated, effectively became trust funds and as such, the funds could not be considered "property of the debtor" in a preference action.  The Ninth Circuit further determined that the repayments in question could be considered trust funds despite the fact that they could not be traced.

*In re Cannon*, 277 F.3d 838 (6th Cir. 2002), involved an attorney whose practice mainly consisted of real estate closings.  On average, Cannon conducted upwards of 150 closings per month.  Cannon maintained several escrow accounts to hold clients' funds which were deposited in connection with real estate transactions.  *Id.* at 843.  Because of the high number of closings, "between $5 million and $10 million per month flowed" through the escrow accounts.  *Id.* Eventually, Cannon began misappropriating funds from the accounts to support personal needs and other business ventures.  *Id.* at 844.  Cannon's ventures began to lose money, and at a certain point the deficiency in the escrow accounts attributable to Cannon's misappropriation reached approximately $1.5 million.  Cannon attempted to conceal the deficit by delaying the processing of credits and debits in the escrow accounts, kiting checks to increase their balances, and utilizing deposits from new closings to pay off the parties to earlier closings.  *Id.*

Cannon's misappropriations came to an end when several checks bounced, and one of the banks he utilized cancelled his account.  *Id.* at 845.  At the time Cannon filed for bankruptcy, the deficiencies in his escrow accounts had grown to over $3.5 million.  *Id.*  During the bankruptcy proceedings, the trustee sought avoidance of the transfers of funds in the escrow accounts belonging to Cannon's clients, moving under 11 U.S.C. § 548.  11 U.S.C. § 548 is a statute that establishes additional trustee avoidance powers for fraudulent transfers.  Bradford was an individual that Cannon had been working with for his other business ventures.  Bradford was

paid approximately $1,137,500 during the year prior to Cannon's filing of bankruptcy.  The money paid to Bradford was traced by an accountant, who determined that the checks were cut from the escrow accounts.  The escrow accounts in question were comprised of both customer monies as well as money from kiting checks and Cannon's personal funds.  *Id.* at 847-848.

The Sixth Circuit determined that the funds Cannon held in escrow for his clients were "without question" maintained in an express trust.  *Id.* at 850.  The Court further held that "under general common law principles, [the personal funds Cannon deposited into the escrow account] became a part of the escrow account and are added to the sums held in express trust on behalf of Cannon's clients."  *Id.* at 851 (citing *Bogert* § 929 which states that a trustee's later deposits of his own money into a trust account are presumed to be restitution for his stolen funds when the account is expressly labeled a trust account) (also citing *Goldberg* and *California Trade*).  The Sixth Circuit concluded as follows:

> Because Cannon held the funds deposited into his escrow accounts in express trust for his clients, we hold that these monies are not part of his estate in bankruptcy and so not subject to the trustee's avoidance power under section 548.  *XL/Datacomp, Inc. v. Wilson*, 16 F.3d 1443, 1449 (6th Cir. 1994) ("debtor that served prior to bankruptcy as trustee of an express trust generally has no right to the assets kept in trust, and the trustee in bankruptcy must fork them over to the beneficiary."  *See also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309 76 L.Ed.2d 515 (1983) ("Congress plainly excluded [from the bankruptcy estate] property of others held by the debtor in trust at the time of the filing of the petition."  Since the funds in the escrow accounts are not a part of the estate in bankruptcy, they are not 'an interest of the debtor in property.'  Therefore, the trustee simply has no power to avoid the transfers to Bradford.

The Sixth and Ninth Circuits have squarely addressed actions by a trustee for avoidance of funds transferred from an express trust to a creditor prior to the filing of a bankruptcy, in situations where personal funds had been inserted into said express trusts.  In both circuits, it was determined that the personal funds inserted by the debtor became part of the trust and were not property of the debtor.  Therefore, as the Sixth Circuit stated, "the trustee simply has no power to

-18-

avoid the transfer[s]."

This Court concludes that the personal monies deposited into the Funding Account by STI, even if the deposits of monies from the Payroll Account could be considered personal monies as the funds in the Payroll Account were actually Funding Account money previously misappropriated to cover payroll costs, and returned to the Funding Account thereafter, became part of the express trust established between STI and Flint, and therefore, ceased to be property of the estate, since no trust, either constructive or express, can be considered property of the debtor.

Because the payment to Flint came from the Funding Account, and because monies in the Funding Account were not property of STI, the Trustee has no power of avoidance.  Flint's appeal is granted and the Trustee's appeal is moot.

## IV.  CONCLUSION

For the reasons discussed above, the Bankruptcy Court's March 28, 2006 Orders are reversed.  An appropriate form of order is filed herewith.

Dated: August 31, 2007

s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.